All right. We're going to now take up the third of our four cases on the calendar, Snow Covered Capital v. Weidner. And I want to make sure I have this correct for the Applees, Mr. Snyder, 10 minutes, and Mr. Pancheri, 5. Do I have that right? Yes, Your Honor. David Snyder, 10 minutes, and I'm going to specifically address the and then turn it over to Mr. Pancheri and Spencer Payne, who will address the contract damages. All right. Thank you. Whenever you're ready, take your time getting ready. Thank you, Your Honor. May it please the Court, I'm Kelly Dove, and I represent Snow Covered Capital. All right. Before you start, I believe that Judge Holcomb has some questions that he would like to address to both sides. So I think we'll start with this. Why don't we stop the clock here for these questions so we'll be able to give you time to address the issues that you have briefed. But why don't you bring up your questions on this one point, Judge Holcomb, and then we can also, if necessary, give some additional time to the Applees as well. Thank you, Judge Bennett. So the issue is whether this court and the district court had subject matter jurisdiction over this case to start with. The complaint, which is at ER, I'm looking at ER 479 and 480, actually 4ER, recites that or alleges that the district court had subject matter jurisdiction, diversity jurisdiction, and 1334 bankruptcy jurisdiction. I question whether there was bankruptcy jurisdiction, but one can put that aside because at some point, Snow Covered Capital settled with the debtor, Lucky Dragon LP, and I think bankruptcy jurisdiction ceased to be present to the extent that it was at that point. So we've got diversity jurisdiction, and that was alleged. This complaint was filed in April of 2019. The allegation in paragraph five on page 480 is that Snow Covered Capital is an LLC. They're a nested LLC. Bottom line is the allegation is the owners of these three limited liability companies are individuals residing in California or trusts whose trustees are citizens of Delaware and Alabama. So the allegation is citizenship for the plaintiff's side is California, Delaware, and Alabama. And then on the defendant's side, we've got the three individuals, Nevada, Nevada, and Texas, and we've got the limited partnership, which let me ignore that in view of the settlement. So we've got Nevada, Texas. On the defendant's side, we've got allegedly California, Delaware, and Alabama. Now, as I said, this was filed in 2019. In 2022, Congress amended the Federal Rules of Civil Procedure to add Rule 7182, which imposes an obligation on parties to reveal, disclose, identify the citizenship of all of the individuals, entities, whose citizenship matters for diversity purposes with particularity. My words, I'm paraphrasing. So I think in 2022, at the latest, there should have been a more definition of who these individuals are, who were owners or managers of the limited liability companies, what trusts we're talking about, who the trustees are with specificity. I looked at the record and I couldn't find any more reference to a diversity subject matter jurisdiction analysis. I think the answer concedes these points. And as I say, I didn't find anything more. But this court and federal courts in general always have an obligation to ensure that they have jurisdiction. And I'm not sure that we do. We have allegations, but we don't have enough. In my view, I'm concerned we don't have enough specificity. So the first question is, as this case was litigated, was this ever addressed? Was it ever revealed on the record or in some way that would matter who the individuals are, who were the owners, managers of the LLCs, who the trustees were, what the trustees, what the trusts were? Did that come out? Was that analyzed? How do we know for sure that we have subject matter jurisdiction? I don't think that was ever litigated. And, you know, with a few minutes, I could probably get more answers, but I did not look into that in preparation for this argument. So I'm sure we could either get an answer during the course of my friend's argument on the other side or, by the end of the day, file a document that specifies the citizenship to allay any concerns. But I am not aware of anybody from Nevada or Texas within the snow-covered capital side. Oh, let me ask, is there anyone on the Appaloose side that has any information on this at this point? I don't think there is. Yeah, I'll repeat, Gary, for Mr. Weiner. We're trying to remember it, but this case went on for a long time. And Mr. Hurtquist just reminded me, I think it was on the first day of the trial, there was some discussion and disclosure regarding snow-covered capital and we'd have to go back and look at the transcripts. Now, just for clarity, is the question about snow-covered capital, LLC, not the Lucky Dragon partnership? Well, it's both, but I think Lucky Dragon matters less because, as I said at some point, that defendant entity settled out and was no longer a party. When this case went to trial, that entity, there's only two individual personal guarantors who were the defendants by then, correct? Correct. And maybe their entity, but yes. So this is what I'd like to suggest, subject to my colleagues' views. What would be ideal is if the parties could submit something jointly on this, if they agree as to the facts and say within the next seven days. And if the parties don't agree, then separate filings on this with answering Judge Holcomb's questions and the general question about jurisdiction within the next seven calendar days. Is that all right with you, Judge Sanchez?  Is that all right with you, Judge Holcomb? Yes, thank you, Judge Bender. All right. And if you do have something else you want to say during the argument today, that would be fine, but there's no need to do that. Obviously, we brought this up, so a spot wasn't addressed in the briefs. And so at this point, why don't we just proceed with the argument as you and your friends had planned? Okay, thank you. I will try to reserve five minutes for rebuttal if I'm able, and I will keep an eye on the time. To start, we appreciate that the district court's fair market value determination is reviewed for clear error. A finding is clearly erroneous, of course, if it is illogical, implausible, or without support. But review for clear error while a high burden does not mean no review at all. And while this dispute concerns the appraisal of real property, much of the error here that I'd like to address today is mathematical, and we think satisfies the clear error standard. So we've detailed in our brief the tortured history of the Lucky Dragon Hotel and Casino, which by the time of the October 2018 foreclosure sale was a vacant building encircled by a chain-link fence. We went through the sales history, the default, and the many, many attempts over a two-year period to try to sell this property. The district court chose not to entertain most of that sales history in making its determination. But critical here, three appraisers testified at trial, and all three appraisers used an income approach and used the same gaming control board data, and they each used a very similar three-step process, albeit with different models and different inputs. First, they each came up with a positive, stabilized EBITDA following the Lucky Dragon's negative $20 million EBITDA. So that really had to be sort of created from scratch because we're dealing with a business and a property that started with the negative. Because your time is running short, what is the mathematical error? Because I think we're well aware of how the appraisers came up with their estimates. Yes. So the mathematical error is that the district court adopted DeFederico's methodology, largely adopted DeFederico's number, and then just took a small haircut off the top and said, well, I am picking DeFederico. I like how he did this. But we need to account for the fact that he used mega-resort data in his analysis. And where the district court error is, it did not appreciate the difference that the change in inputs would have in the overall fair market value under DeFederico's own model. But it did because it did take that haircut at the end. So I guess what you're really saying is it should have done a different kind of weighing with that input. Yes. I mean, as I understand it, the district court found a little bit of fault with all three appraisals, which is not unusual. You know, here's a problem with this. The multiplier is wrong in these other two. Here's another issue with one of them where, you know, where you're not breaking down the kind of revenue generation. I'm not sure where I see where mathematical error comes in as opposed to evidence weighing, which, as you said, is very difficult to overcome on a clear error standard. Sure. So the problem with the district court's haircut is that this 5.9 percent, 3.7 million, I'm just going to knock this from a little over 63 million to 60 million flat, just is completely outside of DeFederico's methodology and analysis. But does that take into account the district court's finding where he says, you know, 27 paragraph 53, I agree with Kimmel that this property is very difficult to appraise because it is betwixt and between. I mean, isn't the district court here doing what triers of fact are supposed to do when coming up with how to how to harmonize three different appraisals by three qualified experts with regard to a property that is difficult to appraise because it doesn't neatly fit into a particular type of appraisal bucket? I mean, isn't there got to be some discretion there when you have something that I think the district court fairly characterized as betwixt and between? That is correct. It's betwixt and between, and it doesn't squarely fit in certain categories. And that's why, for example, choosing comparable properties was difficult. And the district court, the district court's agreement perhaps with DeFederico's choice of comparable properties would be something that would be entitled to deference. The problem here is that all of this is data driven and everyone, everyone agreed, including the district court's finding that the Lucky Dragon is not a strip mega resort property. Yeah, but at the same time, the district court pointed out that Kruger and Kimmel had properties that are less comparable, but on the low end, you know, smaller downtown casinos. So that input was bringing in revenue estimates that were too low, right? Sure. And so that's the betwixt and between problem of trying to figure out what's the most credible fair market value for these. So the problem is that it's betwixt and between, but everybody agrees it's not in the $72 million plus mega resort band. And the other problem is that the district court, I think, got confused about the $1 million plus Clark County band, which is called $1 million plus, but is dominated by the $72 million plus band, which comprises 92 percent of that band. And so the district court recognized and diagnosed a problem, which was that DeFederico relied on mega resort numbers, but did not adjust. I mean, one of the things that the district court also noted was that Kimmel, one of the appraisers, acknowledged that if you exclude some of the downtown properties in this revenue band, that they're not truly comparable. And his EBIT estimate would be closer to $20 million, basically double what he had, which if you scale that up, and I'm not sure that you would, would come out to a fair market value of $73 million, which is even higher. So again, you know, these inputs are imperfect, but that's what a district court does in trying to hash out what to do between the three different appraisals. That's right, but that's in a different step as well. So the question of comparable properties is what determines the EBITA multiplier, whereas the real driving force of DeFederico's numbers were its sensitivity to the RTD number. And that RTD number was, it's just undeniable that it comes from the $72 plus million band, because that's the $3,368 number, which he compares, he lowers it to $3,000, but that's still the $1 million plus, which again is dominated by the $72 million. And there isn't, there are other bands. So there's a band that's downtown $12 million plus, and the band that we think probably would be more appropriate, which is the $36 to $72 million band. Because again, there's no dispute that the Lucky Dragon doesn't belong in the $72 million band. So to the extent that there's disagreement about what other band the court should look to or the appraiser should look to, to determine an RTD value, nobody is arguing that the Lucky Dragon is above the $72 million mark. And the district court found that, and that's our point, part of our point here. I thought part of the issue was that DeFederico testified that the RTD number of sub $3,000 was just an example, but on a perspective basis he was giving sort of a mixed bundle of what the possible revenue generation was. So if that's in the record too, why wouldn't the district court be entitled to rely on that testimony, as opposed to your assertion that this RTD of $3,300 was driving everything? So the RTD, he compared the $3,000. He also used the mega resort hold percentage, which doesn't apply to a casino of this size. And even though the answering briefs attempt to minimize the percentages, like, oh, one is 13.47% as opposed to 11.45%, but even that change in hold percentages results in a $10 million difference in the fair market value. And so the problem is the district court, this isn't a residential sale. What about the fact that the district court found a problem with the multipliers for Kruger and Kimmel, because they were using sales out of, you know, Pennsylvania, other places, and DeFederico? I guess what I'm saying, my view is it seems as if you're just trying to relitigate your disagreement with DeFederico, which is not our task for a clear error review standard, right? We're not the trial court. We're not here to rehash, you know, who's more credible versus not. I'm not seeing what clear error is in your attempt to try to nitpick at DeFederico's testimony. So our point is the district, so we're not advocating, we're not making the argument, which I think would not win on this standard, that he should have followed Kimmel or Kruger right now. We're operating completely within the bounds with what the district court did, which was I'm picking DeFederico, and the inclusion of the mega resort data is a problem, and so it needs to be discounted. But then in taking DeFederico and just removing 3.7 million, it's completely untethered to DeFederico's methodology. And if we're, yeah. Council, when I look at what I think my colleague was quoting from, maybe paragraph 57, Kimmel used sales that were more remote in time. The only Vegas property he used was Club Fortune, which has no hotel. Kruger relied on sales from Pennsylvania and Missouri and Club Fortune and included pro forma instead of trailing. And Kimmel and DeFederico used trailing, and trailing is based on actual numbers where pro forma is their estimate, and estimates are thus more risky and less accurate. And those seem to me to be very normal and appropriate types of conclusions, very detailed by a trier of fact that I think finds support in the evidence. And so it's not, I have trouble seeing the untethered part that you're talking about because the court makes all of these findings and appears to be taking them into account and coming up with a number. And in that analysis, Your Honor, the court was actually erring and comparing apples to oranges a bit because, again, the comparable sales, which he didn't care for from Kimmel, is part of the EBITDA multiplier and not part of the RTD. And really, a decrease of either of those numbers on either of those steps results in a deficiency. And so if this were just a residential sale where there's three properties in a neighborhood and one sold for $500 and one sold for $700, and an appraiser comes in and says, well, this one had an updated kitchen and this one had this feature. But this was a highly technical analysis that all three appraisers undertook and the district court undertook as well. So the district court's order goes through the multipliers and the sales. And then in coming up with a discount, instead of looking at the math and looking at, oh, if we're appropriately using RTD data from the gaming control board in the $36 million to $72 million band instead of the mega resort band, which I know doesn't apply, that actually has a drastic effect on the output and the fair market value. So this isn't just about spitballing what this casino is worth. This is a detailed analysis, and that's why our point that the haircut is insufficient is because it's not based on any of that analysis. It's like taking a very detailed process and then just sort of making a, well, I guess I'll take $3 million off to find a fair market value that's just a smidge above the indebtedness number. So are you alleging that the district judge here was results-oriented, that he wanted to get to a number and figured out a way to get there? I would never make that argument. Because I didn't see that in your papers, but are you arguing that? No, I think the district court genuinely misunderstood the effect of even small changes in the RTD, the effect in the fair market value outcome on the other side. I would not disparage the district court. So this is complicated, and that's our point. The district court, we think, correctly found that DeFederico's analysis, because he says, I don't agree with it in total. The problem is it includes mega resort data, and we need to discount to account for that. But to account for that requires taking more than just this $3 million. And I just think in these complex calculations, the district court did not appreciate that, for example, lowering an RTD amount by $200 or $300 results in an enormous change on the other end under DeFederico's analysis. Ms. Dove, can I ask you to switch gears for a second? So part of the appeal are about these extra damages that you're seeking, and it's not entirely clear to me what the nature of those, whether there's attorney's fees or costs or what it is. But here's my concern about it. You've got a stipulation that addressed the totality of pre-foreclosure damages. And to me, my reading of it makes pretty clear that you would not be asking for any other pre-foreclosure damages. And then you've got a survival clause in the guarantee that would seem to If that's so, why isn't that dispositive of all of your extra damages claims? Because the guarantee, which, as we explained, is called a bad boy guarantee, colloquially, is meant to compensate the lender for litigation expenses, irrespective of whether it's a prevailing party. So expenses including fees, yeah. I'm saying there's a survival clause in the guarantee that says you can recover up to the point of foreclosure. So that is not an analysis, in my view, of who's prevailing or not, just you're not entitled to any post-foreclosure recovery. So why isn't that dispositive for any post-foreclosure damages claims that you're asserting? Our position is that the survival clause takes it past foreclosure. But even if it's just pre-foreclosure, that still opens the door to expenses that were incurred in the bankruptcy. But then how do you get around your settlement, which said, for pre-foreclosure we agree that this is the sum total of all the expenses that are at issue and we're setting that aside and now we're having the bench trial. How are you now coming back and asking for more pre-foreclosure expenses? Because my understanding of that number is that's the indebtedness number that did not And it says total. Well, and I can refine that so I can better answer your question. But it also says further SCC agrees not to offer or argue that there are any other pre-foreclosure damages other than those agreed upon in the stipulated indebtedness. We're in the same paragraph, right? Right. Yeah. Well, we were looking for mainly fees that were incurred in the bankruptcy and outside the indebtedness. All right. Thank you. You've used your time. I have. Thank you. We'll give you two minutes for rebuttal. Okay. If I may, I'd like to pick up on some of the questions that were asked. Of course, I think they go to the heart of why this appeal is not and the arguments are not appropriate. And specifically, they really are trying to retry this case. And that's really what they're doing at their core. And virtually everything that they argued on appeal, both in terms of the papers and here today, was considered and either accepted or rejected by Chief Judge Gordon. And while sometimes we gloss over the standard of review, I think it really is important to focus on a little bit more for just one second. The cases are clear that they make a particular distinction with evaluation cases. Because I think of some of the nature of what Your Honors have been getting at. And they say that when it comes to valuation issues, trial courts have particularly broad discretion. And an appellate court's power of review is particularly narrow. And taking even further, and Your Honor asked the question that I've been trying to ask the entire appeal, which is where's the math error? And I think in essence what they were confronted with is exactly what we believe happened here, which is these are factual issues. So I've got to come up with a way to make it not a factual issue. So I'm going to say it was the judge didn't understand it, which I think frankly is a little insulting, and not that Chief Judge Gordon needs me to defend him, that he didn't appreciate and made a math error, or that he acted arbitrarily, and none of it is the case. I agree that your friend has not made out, in my view, a math error claim. But I think what they're really saying is that without explanation he invented a haircut number. And I'm not buying into that, but I'm saying I think their argument is that he came up with a haircut number, he had some predicate explanations as to why he liked some parts of some appraisers, didn't like some, but that then there was just sort of this magic haircut number with no explanation. So that was exactly what I was going to ask because I think it's critical. So first of all, there is not one case that they can cite or do cite that required the judge to do anything more than he did. In fact, the cases say that fair market value determination is one of fact, and not based on fixed rules or formula. And SEC concedes that there's no requirement that they use a precise formula, and that it's very common for trial courts, when considering conflicting appraisals, to use, quote, non-quantitative reasons, end quote, for determining fair market value, and that's the Tahoe case. And that valuation is as much an art as it is science. And what the judge did here, after a very lengthy and thoughtful background, he came up with what was, in his best judgment, the value of this property. There's nothing that was required more than that. And judges and juries, when they're fact finders and appraisers, do that very thing all the time. They use their judgment. And let me give you a couple quick examples. In this particular case, and there are appraisers. Because, again, appraisers don't always, you know, plug in inputs and magically a value comes up. So let's take the multiples, which we addressed very briefly. In the multiples, what both sides did, all their appraisers, is they looked at the sales. Because the multiples are determined on comparable sales, right? And they have, here's what this sale did and this sale, and then it has a range. And then they pick a number. They don't say it's one-tenth minus, you know, 62. They say, on my judgment, this is what it is. And more specifically, and maybe even more applicably, Mr. Kimmel, when he selected his EBITDA, which was perhaps one of the most important, obviously, components of the case, he said he didn't go through the analysis in terms of category by category. Instead, what he did was he took what he believed, based on the evidence data he believed was appropriate, and he said, here's what the average is for this evidence for these casinos for EBITDA. And I'm going to take 30% off. Doesn't say why he's going to take 30% off. He just says, I've been doing this a really long time, and based on my judgment, that's the right number to do it. That sounds like Kumho Tyre to me. But we have no Daubert issues before us, correct? That's right. And in essence, there's nothing that wasn't admissible that should have been, et cetera, et cetera. I mean, it's just basically what they're complaining about is that the judge didn't agree with them, that he didn't agree with the inputs that they used, et cetera. And I want to correct a couple of things. One is he didn't just do a, I'll use the haircut phrase, but I'm not sure it was a haircut, but the $377 million, there was a step above it. And the step above it is, first of all, they keep pointing to this 3,368 RTD number. That is not the number that actually Mr. DeFrederico used. It was a $3,438 what he used. And Mr. DeFrederico then took the 3,438, which represented the table games in his new mix, those specific table games, and as he put it, the market said, what does that look like? It's 3,438. And he conservatively took that down to 3,000 for his projection for table games. So before Chief Judge Gordon even got to the next step, there was already an almost 13% deduct from that over $1 million, including the mega resorts. And then he took another almost 6% off of that to get to his final number. And was he doing that because of this in-between issue? I think at the end of the day, he was terrific, and I think he listened to every single thing that was said, and he considered and he asked questions. I think at the end of the day, that was his judgment, is that he thought that maybe Mr. DeFrederico was a little heavy because of the large resorts, but he felt that, and again, everything was made, this was all argued at trial, that he first knocked it down to the 3,000, and then he felt another 3,770 was what it should be knocked down again, based on his judgment. And there's no requirement in the law for him to do any more than that, to do any more explaining than that. I think it was a remarkably well-thought-out, and I'm not just saying that because we won, but that it was a very well-thought-out, thoughtful analysis, including the sales attempts, including the multiples. And I'm running out of time, but I just want to mention one other thing. And Your Honor brought up the multiples, I think, and there were a couple elements we pointed out in our brief. They had the requirement to prove a deficiency, every element of a deficiency, and there were a couple clear examples when they didn't prove it. One is the multiple. The judge clearly, and I think they really don't defend their own multiples in the brief. They were really out of whack. They really relied on bad comments, which I can get into, but I'm running out of time. I think that alone kills their appeal. And the second is Mr. Krueger, each of the three appraisers talked about the number of table games. Two of them, including Mr. Kimmel and Mr. DeFederico, said 37, and Mr. Harper said, I think it was, I'm sorry, Mr. Krueger said it was, I think, 23, and the judge said that was contorted. You throw that out, that really knocks out their case as well. So I also don't believe they met their burden, unless the court has any questions. I have a question.  Paragraph 62 of the district judge's findings of fact and conclusions of law, it's in the record 1 ER 30. The judge notes that in connection with the bankruptcy case, Snow-Covered Capital offered a couple of valuations characterized as Harper valuations. This was in January and March, January and May of 2018. One was $60 million and one was $55 million. The district judge says, I give no weight to the Harper appraisals, okay, but then he says that it is fair to include as data points Snow-Covered Capital's representations to the bankruptcy court. So did he take these Harper valuations into account or did he not? He did not take them into account in terms of the actual valuation component. What he took and what he means by data points is we had a lot of skirmishes over the extent to which the sales history should come in. And we filed a motion to get rid of the time period before the bankruptcy and the bankruptcy, which they continue to dwell on. And we lost that motion. So what the judge said was, well, if I'm going to let them talk about that time period, I'm going to let these guys also include it. And I believe what it really means is that to say that the property couldn't be sold during that time period shows why it wasn't a real fair market value sale, because their own appraiser says during that very same time period it was worth $60 million. So there must have been something not right in the sales process. So I think I don't want to, you know, put words in the judge's mouth, but based upon living with this case and seeing the way he wrote it, I think that's what he meant by the data points. Thank you. Thank you. Thank you, Your Honors. I'll hand it off. Thank you. Oliver Pankary for William Widener, the appellee. May it please the Court. Picking up on the point that Judge Sanchez made about the 3.7 of the guarantee, the survival clause, 3.7 is consistent with Nevada law. NRS 40.459 parens 2 says that a judgment cannot enter for more than the difference between the delta, between the indebtedness and the fair market value of the property on the date of foreclosure. And that protection is afforded to guarantors, and the court could not enter a judgment in excess of that amount. Now, in terms of the actual ---- In other words, what you're saying is whether we get there through the survival clause or Nevada law, it's the same. Correct. If the indebtedness is satisfied, Nevada law says you can't reach the guarantors either. Correct. So in terms of the other point made by Judge Sanchez in terms of specific items of damages other than attorney's fees, there are only two of them that are mentioned in the brief. One is transfer taxes for $178,500. That's expressly in the stipulated indebtedness. So that's gone. This is 2 ER 0124. And the second they refer to as marketing, pre-foreclosure marketing expenses. That, again, would fall under the pre-foreclosure part of the stipulation that is prohibited under paragraph 2. I'm sorry. For the first one that you mentioned on ER 124, what number is that in the category list? So it is the fourth one down, transfer taxes. Okay. The number being 178,500. Correct. Okay. Thank you. So and then in terms of the fees, which is the second issue that's being challenged, the attorney's fees, the district court gave a procedure for the parties to follow in terms of attorney's fees. The procedure was to file a motion pursuant to Rule 54. I'm sorry. What was the second item that you mentioned? Oh, it was $400,000 in marketing fees. And was that pre or post? They referenced it as pre in their brief. But those are the only two specific items that are referenced. Now, whether fees are analyzed as fees as fees or fees as damages, they still have to be reasonable under the terms of the guarantee and under the law. Stoke-Huron Capital failed to provide any evidence of the work performed, the need for the work, the hours spent, or the rates. They gave nothing to the district court, and that was one of the reasons why the district court denied their motion for fees. Stoke-Huron, their excuse for that is they said they anticipated there would be a second phase of trial. And they cite to the transcript from the district court from a hearing on February 5th, 2024, and I quote, if I decide ultimately there are no post-foreclosure damages, it's done. If I decide there's a chance for post-foreclosure damages, we'll have a second phase of trial. And the court ultimately decided there were no post-foreclosure damages. In that same order, that was from July 2nd, 2024, the district court ordered Snow-Covered and the guarantors to meet and confer about any attorney's fees and costs under 54D and 1.8 of the guarantee. If no agreement could be reached, then Snow-Covered was to file a motion for those fees. No agreement was reached, and the motion was filed, but the motion did not include any of the information provided to be able to establish whether the fees are reasonable or not. And that is required under Local Rule 54-14 and under the Nevada Supreme Court case Brunzel. That's how you determine if fees are reasonable. And Snow-Covered failed to comply with that. And in addition to, so that was one of the reasons the district court denied the motion for fees. The other was the court went through each category of fees and made a separate determination why they were not reasonable. That included the fees relating to bankruptcy, fees relating to ancillary proceedings. There were two fraudulent conveyance cases that were filed against the FONFA estate, plus a probate action. The court found, well, if there's no deficiency, it's not reasonable to pursue these fraudulent conveyance actions. Similarly, with the fees incurred in this action, the court found where there's no deficiency, it's not reasonable to incur these fees. That was the court's rationale in terms of denying the fees. It would be against public policy. And even Snow-Covered in the reply on page 37 says, it is uncommon for a non-prevailing party to recover fees. Yet, they asked the court to find it was error for the district court to not award them attorney's fees. They claim that because they almost prevailed, they should be entitled to prevailing party status. Your Honors, they sought tens of millions of dollars as the deficiency, and the deficiency was zero. They did not almost prevail. The district court's decision should be affirmed. All right. Thank you, counsel. Thank you. Thank you. I'll be brief. We fully respect the standard of review here and understand what that presents for us, which is why, in our appeal, we stayed within the framework of what Judge Gordon adopted and what the district court adopted and why it was error within the DeFederico framework. We weren't here arguing that he should have chosen a different expert. And, again, for lack of a better term with the haircut, we think the error comes from where he says that the mega-resort data renders the amounts somewhat higher when, in fact, they render it's a night-and-day comparison and the somewhat higher is where the problem is. Additionally, we didn't discuss Ahearn's testimony very much. The district court also credited Ahearn when he testified, albeit by virtue of a deposition that he had taken in March 2020, that he anticipated maybe doubling his money in two years and thought that was consistent with his decision that the DeFederico number and his ultimate number were correct. And we think he misconstrued that testimony as well because Ahearn testified, maybe I'll double my money in two years after it's stabilized and I put about $10 million in it. And that's actually that dovetails right with Kimmel's valuation. So we're working within the framework of what the district court chose to credit and what the district court chose to adopt and think there's clear error even within that framework. And finally, with respect to the fees, when fees are damages, they're not sought through Rule 54. My friend quoted the district court's statement correctly that the district court indicated that if there were any potential for further damages, there would be a second phase. So in briefing whether there could be further damages, that was not the time for Snow-Covered Capital to bring in its billing statements and make its fee application. This was a threshold briefing as to whether there would be further fees allowed. Rule 54 just doesn't apply here. It's for post-judgment. We brief that in our reply that the local rule goes back to the federal rule. It's all under 54 and it's post-judgment. These are fees as damages and so they don't get treated as post-judgment prevailing party fees under Rule 54. And I appreciate the court's time. Thank you. All right. We thank counsel for their arguments. The case just argued is submitted. The counsel reserves the right to vacate the submission depending on the party's filing with regard to the jurisdiction issue. Thank you, counsel. With that, we will get to the final case on the argument calendar, Lamas v. Clark County School District.
judges: BENNETT, SANCHEZ, Holcomb